

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-15-2004

# Local 57 v. Sage Hospitality Res

Precedential or Non-Precedential: Precedential

Docket No. 03-4168

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Local 57 v. Sage Hospitality Res" (2004). *2004 Decisions.* Paper 107.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/107

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-4168

———

HOTEL EMPLOYEES & RESTAURANT EMPLOYEES
UNION, LOCAL 57

v.

SAGE HOSPITALITY RESOURCES, LLC,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Dist. Ct. No. 02-cv-01624)
District Judge: Honorable Gary L. Lancaster

———

Argued: May 12, 2004

Before: NYGAARD, MCKEE, and CHERTOFF, *Circuit
Judges*.

(Filed: November 15, 2004)

JOHN M. O'DONNELL, ESQ. (Argued)
Littler & Mendelson
625 Liberty Avenue
Dominion Tower, 26th Floor
Pittsburgh, PA 15222

*Attorney for Appellant*

TERRY K. LECKMAN, ESQ.
Lipsitz, Nassau & Schwartz
1100 Fifth Avenue
Pittsburgh, PA 15219

ARLUS J. STEPHENS, ESQ. (Argued)
Davis, Cowell & Bowe
1701 K Street, N.W.
Suite 210
Washington, DC 20006

*Attorneys for Appellee*

———

OPINION OF THE COURT

———

CHERTOFF, *Circuit Judge*.

In this case, we examine whether federal labor law preempts the City of Pittsburgh's decision to condition a grant of tax increment financing upon the recipient's acceptance of a labor neutrality agreement. We must address how labor law preemption analysis applies when local government seeks to affect labor relations on a publicly financed development project. For the reasons stated below, we hold that the City is not preempted from requiring parties receiving tax increment financing to sign a labor neutrality agreement.

I

In early 1998, Sage Hospitality Resources, LLC ("Sage") began development of a hotel construction project in Pittsburgh, Pennsylvania (the "City"). As part of its financing strategy, Sage approached the Urban Redevelopment Authority of Pittsburgh ("URA")[1] for tax increment financing ("TIF") to support the

———

[1] Incorporated in 1946, the URA is one of Pittsburgh's redevelopment authorities that serves as a "developer of last resort."

construction of the hotel.

Authorized under Pennsylvania's Tax Increment Financing Act, 53 Pa. Cons. Stat. § 6930.1 et seq., TIFs were created to "provide an alternative method for use by authorities in pursuing redevelopment efforts under the Urban Redevelopment Law[, 35 id. § 1701 et seq.]." 53 id. § 6930.2(a)(3). In a traditional TIF scheme, a locality issues tax increment bonds to finance the redevelopment of a chosen district. These bonds are secured by tax revenues generated from the expected increase in property values—i.e., the tax increment—in the district. See generally Frank S. London, Note, The Use of Tax Increment Financing to Attract Private Investment and Generate Redevelopment in Virginia, 20 Va. Tax Rev. 777, 780-81 (2001). That is, TIF pledges future increases in tax revenues generated by a project to finance certain eligible costs for the project.[2]

The URA approved the creation of the Fulton Building TIF District and issued the TIF bonds. Sage was apportioned $3.56 million in TIF support for the hotel development project. The plan provided that some sixty percent of revenues from the tax increment would go toward the repayment of the TIF notes. The remaining forty percent of the revenue from the tax increment would be provided to the three taxing bodies, the City, the School District, and Allegheny County.

On February 2, 1999, following the approval of the TIF funds, the City passed Resolution 45, which required Sage, inter

---

Urban Redevelopment Auth. of Pittsburgh, About the URA, at http://www.ura.org/aboutTheURA.html (last visited Oct. 8, 2004). Urban Redevelopment Authorities were promulgated under the Urban Redevelopment Law, 35 Pa. Cons. Stat. § 1701 et seq., to promote development in blighted areas. Id. § 1702. The URA is comprised of the City of Pittsburgh, the School District of Pittsburgh, and Allegheny County.

[2] The increment is computed by determining a predevelopment property value baseline. Increases in value due to the project's completion and operation constitute the tax increment. The mechanics of TIF payments are outlined in Pennsylvania State Building & Construction Trades Council v. Prevailing Wage Appeals Board, 808 A.2d 881, 886 & nn.5-6, 9 (Pa. 2002).

alia, to "enter into a post-construction certified labor agreement with a bonified [sic] labor organization recognized by the National Labor Relations Board." (App. 60 (emphasis omitted).) Approximately five months later, on July 27, 1999, the City passed Ordinance 22 to supplement Chapter 161 under Title One, Article VII of the Pittsburgh Code.[3] The Ordinance added section 161.30, "Requiring Contractors and Employers of employees hired to staff hospitality operations to be signatory to collective bargaining agreements where the City of Pittsburgh has a financial or proprietary interest." (App. 47 (emphasis omitted).)

This section provides, in pertinent part:

Each and every Contractor and Employer of employees hired to staff hospitality operations shall be or become signatory to valid collective bargaining agreements or other contracts under 29 U.S.C. Section 185 with any labor organization seeking to represent Hospitality Workers employed in the Contractor's and/or Employer's Hospitality Operations in a Capital Project as a condition precedent to its contract with the City of Pittsburgh. Each collective bargaining agreement or contract must contain a provision prohibiting the labor organization and its members, and in the case of a collective bargaining agreement, all employees covered by the agreement, from engaging from any picketing, work stoppages, boycotts or any other economic interference with the Hospitality Operations of Contractor or any persons under contract to it for the duration of the time required for the repayment of public indebtedness incurred to finance the acquisition or development of such Capital Project, or for the duration of Contractor's contract or contracts with the City for the operation of such Capital Project, whichever period of time is more extensive (the

---

[3] Title One, Administrative, Article VII, Procedures, Chapter 161, Contracts.

4

"No-Strike Pledge"). Each agreement must provide that during this time period, all disputes relating to employment conditions or the negotiation thereof shall be submitted to final and binding arbitration. Each and every Contractor and Employer of employees hired to staff Hospitality Operations shall require that any work under its contract or contracts with the City to be done by the Contractor's or Employer's contractors, subcontractors, tenants or subtenants shall be done under collective bargaining agreements or other contracts under 29 U.S.C. Section 185 containing the same provisions as specified above.

(App. 48.)

By February 2001, construction of the hotel had been completed, but Sage had not yet entered into a labor agreement with any labor union. On February 13, 2001, the City passed a resolution dissolving the Fulton Building TIF District and withdrawing the issuance of the $3.56 million TIF funds because Sage had not entered into a labor agreement under Resolution 45 and Ordinance 22.

One week after the passage of the resolution, Sage signed a Labor and Neutrality Agreement (the "Neutrality Agreement" or the "Agreement") with the Hotel Employees and Restaurant Employees Union Local 57, AFL-CIO ("HERE"). The Neutrality Agreement contained, inter alia, a no-picketing promise and a provision that union representation would be determined using a card-check procedure. The Agreement provided that disputes arising under it would be settled by arbitration. Following the Agreement, the Mayor vetoed the City Council's February 13 repeal of the Fulton Building TIF District, and Sage received funding.

Following the opening of the hotel on March 16, 2001, HERE asked that Sage hold a "card count" to obtain recognition of its union pursuant to the terms of the Neutrality Agreement. On June 19, 2001, the City concluded "that a majority of employees [at the hotel] . . . has not designated the Hotel Employees, Restaurant Employees Union, Local 57 as their [sic] exclusive

5

collective bargaining representative." (App. 67.) Citing the Neutrality Agreement, HERE sought to arbitrate the outcome of the card count and requested a second card count in June of 2002, but Sage refused to comply with the request, claiming that the Neutrality Agreement was void.

On September 20, 2002, HERE filed a complaint in the District Court seeking to compel Sage to arbitrate issues arising pursuant to the Neutrality Agreement. Sage defended by arguing that the Neutrality Agreement was illegal and void *ab initio*.

In May 2003, both parties filed motions for summary judgment. In a memorandum issued on September 30, 2003, the District Court rendered a decision in favor of HERE and directed the parties to submit their dispute to arbitration pursuant to the Neutrality Agreement. The District Court held that (1) both parties were within their rights to reach a private agreement to provide an alternative method of deciding union representation and that such chosen method, i.e., card check procedures, was not illegal under federal law; (2) the Agreement's provisions for card check procedures did not constitute payment of "things of value" prohibited by section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186; and (3) economic duress could not be used as a reason to invalidate the Agreement. The District Court ordered the parties to submit their dispute to arbitration pursuant to the Agreement.

We are presented with a final order of a District Court to review. Accordingly, we have appellate jurisdiction. 28 U.S.C. § 1291. Our review of a District Court's grant of summary judgment is plenary. See Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co., 316 F.3d 431, 443 (3d Cir. 2003). We assess the record using the same summary judgment standard that guides district courts. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©).

II

In this appeal, Sage claims that (1) the Agreement HERE

seeks to enforce is void *ab initio*, or voidable at its option, as having been secured in violation of federal law, specifically the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq.; (2) the terms of the Agreement require Sage to provide "things of value" to HERE in violation of section 302 of the LMRA; and (3) the Agreement is void *ab initio* because Pennsylvania's Home Rule Charter statute, 53 Pa. Cons. Stat. § 2962(f), prohibited the City from imposing the requirements set out in its ordinances and resolutions.

A

Sage's first argument is that the Neutrality Agreement signed with HERE is unenforceable, as a matter of law, because it intrudes into a field governed by federal labor law. Specifically, Sage argues that Ordinance 22 is preempted by section 7 of the NLRA.

The District Court declined to address the federal preemption question, holding that "[b]ecause the legality of the City's actions is not dispositive in this case and because the City is not, itself, a party to this action, we need not decide this issue." Hotel Employees & Rest. Employees Union, Local 57 v. Sage Hospitality Res., L.L.C., 299 F. Supp. 2d 461, 465 (W.D. Pa. 2004). Instead, the District Court examined the validity of the Neutrality Agreement on its face and rejected Sage's argument that the Agreement should be rendered void because Sage entered into the Agreement under "economic duress." Id. at 466.

Although the City is not actually party to the Neutrality Agreement, the issue of federal preemption cannot be so easily bypassed. If, for example, private parties entered into a neutrality agreement because a city mandated it as a matter of law or regulation, there is no doubt that the question of federal preemption would be presented. See Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608 (1986) (preemption bars city from coercing party to enter into labor agreement). The fact that the government mandates—but is not party to—the labor agreement would not insulate the government's actions from preemption scrutiny.

By the same token, preemption issues are implicated where,

7

as here, the impetus for a labor-management agreement is that the City demands it as a condition of public financing. While such an arrangement may turn out to escape or survive preemption analysis on the merits, we may not simply assume the question away by limiting our focus to the four corners of the Neutrality Agreement. See, e.g., Hotel Employees & Rest. Employees Union, Local 2 v. Marriott Corp., No. C-89-2707, 1993 WL 341286 (N.D. Cal. Aug. 23, 1993). Thus, we begin our examination of whether the Neutrality Agreement is valid by looking to the City's ordinance. If the City's efforts to promote the Agreement are preempted by federal labor law, then the executed agreement between the parties may be deemed void.

"It is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." Wis. Dep't of Industry, Labor & Human Relations v. Gould Inc., 475 U.S. 282, 286 (1986). Section 7 of the NLRA protects, inter alia, the right of employees to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 8 of the NLRA enumerates "unfair labor practices," including: interference with an employee's exercise of rights guaranteed under section 7; domination or interference with the formation or administration of a labor organization; discrimination in hiring or employment to encourage or discourage membership in a labor organization; the refusal to bargain collectively; forcing or requiring an employer to join a labor organization; forcing an employer to bargain with a particular labor organization as the collective bargaining agent of its employees if another labor organization has been certified as the representative of such employees; and forcing or requiring a person to stop using, selling, or dealing in the products of any employer, producer, or manufacturer. See 29 U.S.C. § 158.

Though the NLRA contains no express preemption provision, we will find a state or local rule to be preempted by implication if "it conflicts with federal law or would frustrate the federal scheme, or . . . [if we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985) (quotation marks omitted).

8

The Supreme Court has carved out two distinct implied-preemption doctrines around the NLRA. The first, "Garmon preemption," forbids state and local regulation of activities that are "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ."); see also Gould, 475 U.S. at 286. The state law may be a law of general application or a law directed specifically toward labor relations. Garmon, 359 U.S. at 246. Garmon preemption prohibits regulation even of "activit[ies] that the NLRA protects, prohibits, or arguably protects or prohibits." Gould, 475 U.S. at 286.

> This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' integrated scheme of regulation embodied in §§ 7 and 8 of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act.

Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 221-22 (1993) ("Boston Harbor") (quotation marks and citation omitted).[4]

---

[4] Garmon also carved out two exceptions under which a state's actions may not necessarily be preempted by federal law. The Court provided that it would not bar the power of states

> to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act.

359 U.S. at 243-44 (citation omitted); see also Belknap, Inc. v. Hale, 463 U.S. 491, 498-99 (1983). The "local interest" exception has ordinarily been applied "where the conduct alleged concerned activity traditionally recognized to be the subject of local regulation, most often involving threats to public order such as violence, threats of violence, intimidation

The second preemption principle, set out in <u>Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission</u>, precludes state and municipal regulation concerning those aspects of labor-management relations that Congress intended "to be controlled by the free play of economic forces." 427 U.S. 132, 140 (1976) (quotation marks omitted). This form of preemption recognizes Congress's desire to balance the power between employers and workers. <u>Id.</u> at 146-47. Under this rule, states are prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts, unless such restrictions were presumably contemplated by Congress. <u>See</u> <u>id.</u> at 147.

The <u>Garmon</u> and <u>Machinists</u> preemption doctrines grew in the context of state laws that regulated the relationship between employers and labor. But what happens when the state acts not as a regulator, but as a market participant that deals as an employer or developer with its own labor force?

In <u>Boston Harbor</u>, the Supreme Court faced a Massachusetts Water Resources Authority ("MWRA") requirement that all contractors working on the Boston Harbor cleanup project must sign a prehire collective bargaining agreement that recognized a specific union and compelled all employees to become union members. <u>Boston Harbor</u>, 507 U.S. at 218, 220-22. Although the requirement impinged upon labor-employer collective bargaining that is normally governed by the NLRA, the Court ruled that MWRA's actions were not preempted by the federal labor statute. The Court reasoned that the MWRA was acting in its capacity as a proprietor, i.e., "market participant," and not as a regulator. <u>Id.</u> at 232. In that sense, the agency was on the same footing as any private employer dealing with its own subcontractors and their labor force.

> There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity

and destruction of property" and also to cover acts of trespass. <u>Pa. Nurses Ass'n v. Pa. State Educ. Ass'n</u>, 90 F.3d 797, 803 (3d Cir. 1996).

10

purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. . . . In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.

Id. at 231-32. The Court sustained the MWRA's mandatory labor agreement because it was not an effort to regulate the conduct of others, but an "attempt[] to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." Id. at 232.

In short, after Boston Harbor, preemption analysis only comes into play when the state's activity in question constitutes "regulation." Id. at 227. But a state will not be subject to preemption analysis when it acts as a "market participant." See id. ("When a State owns and manages property, . . . it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.").

Boston Harbor raises the issue that is pivotal in this case: What is the distinction between government acting as a regulator and government acting as a proprietor or market participant?

We begin by rejecting the notion that the line between regulation and proprietary action can be drawn simply by determining whether the state seeks to affect labor relationships through mandatory or prohibitive regulation on the one hand, or through the coercive effect of government's spending power on the other. The mere fact that government affects labor relations by imposing conditions under its power to procure or to spend does not automatically mean that the state is acting in a proprietary capacity that is immune from preemption review.

That is the teaching of Wisconsin Department of Industry, Labor & Human Relations v. Gould, Inc., 475 U.S. at 287. Applying preemption analysis in that case, the Supreme Court

11

rejected any facile distinction between regulation by mandate and regulation by conditioning public spending. The Wisconsin statute provided that state procurement officers were statutorily forbidden to purchase "any product known to be manufactured or sold by any person or firm included on the list of labor law violators." Id. at 284 (quotation marks omitted). Notably, the prohibition was not limited to firms that violated labor laws on a particular state-funded project, or even on a number of state-funded projects. Rather, it debarred contractors who had violated labor laws on projects inside or outside the state. The Court rejected the claim that the statute "escapes pre-emption because it is an exercise of the State's spending power rather than its regulatory power." Id. at 287. Observing the fact that debarment could be triggered by misconduct wholly unrelated to any transactions with the state itself, the Court held that "by flatly prohibiting state purchases from repeat labor law violators Wisconsin simply is not functioning as a private purchaser of services; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation." Id. at 289 (quotation marks and citation omitted). Preemption analysis therefore applied, and the Court held that "[b]ecause Wisconsin's debarment law functions unambiguously as a supplemental sanction for violations of the NLRA, it conflicts with the Board's comprehensive regulation of industrial relations." Id. at 288.

Accordingly, the line between state regulation that is subject to preemption and market participation that escapes preemption must be drawn more finely than by simply distinguishing between regulation through mandatory laws and regulation achieved through the spending or procurement power. In describing where to draw this line, we begin by reviewing several seminal decisions.

As we have noted, Gould itself involved a provision that broadly disqualified firms with multiple past labor law violations from doing business with the state. Because the predicate violations were historical, and were not limited to transactions with the state itself, the Supreme Court easily discerned that the statute was not related to the state's proprietary interest in ongoing projects, but was simply punitive. In Boston Harbor, by contrast, the municipal authority's bid specification on a particular project required successful contractors to enter into a prehire labor

agreement on the project itself.  This requirement was "specifically tailored to one particular job" and served to protect the municipal authority's interest in labor peace on that job.  507 U.S. at 232.

Gould and Boston Harbor, therefore, reflect polar outcomes despite the fact that both involved an exercise of spending or procurement power.  The pivotal difference is that in the former case the state deployed its spending authority to achieve a goal far broader than merely protecting or fostering its own investment or proprietary interest, while in the latter instance the public agency limited its spending conditions to the  protection of its investment or proprietary interest.

Other appellate courts that have examined the regulator/market-participant distinction also focus on the fit between the challenged state requirement and the state's proprietary interest in a particular project or transaction.   In Chamber of Commerce of the United States v. Reich, the D.C. Circuit addressed an Executive Order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike.  74 F.3d 1322 (D.C. Cir. 1996).  The Executive Order swept broadly, effectively forcing companies doing business with the federal government to avoid "permanent replacements even if the strikers are not the employees who provide the goods or services to the government."  Id. at 1338.  Indeed, even subsidiaries that did not do business with the government would be forced to comply with the order if an affiliated business organization sought a federal contract.  As in Gould, this was a procurement condition that reached far more widely than what would be necessary to protect against disruption of those contracts in which the government had a direct proprietary interest.  Not surprisingly, therefore, the D.C. Circuit held that the Executive Order was a regulatory effort "to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers."  Id. at 1337.[5]

---

[5] The government argued that even this broadly sweeping order promoted the government's proprietary interests because labor strife on projects unrelated to the government can have an overall deleterious impact on the vitality of the contractor.  Reich, 74 F.3d at 1335.  The D.C. Circuit rejected this type of attenuated proprietary benefit as

Preemption analysis therefore applied.

In <u>Building & Construction Trades Department v. Allbaugh</u>, however, the D.C. Circuit declined to find preemption applicable to a much more specific Executive Order that required federal agencies and private entities to maintain neutrality regarding project labor agreements in federally funded construction contracts. 295 F.3d 28 (D.C. Cir. 2002). Even though the Executive Order applied to all federally funded contracts, it applied only to those contracts. The Order did not speak to the behavior of contractors on other, nongovernment projects. The D.C. Circuit reasoned that "[b]ecause the Executive Order does not address the use of [project labor agreements] on projects unrelated to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as 'regulatory.'" <u>Id.</u> at 36. Preemption analysis, therefore, did not apply.

More recently, the Ninth Circuit has also addressed the regulator/market-participant distinction. In <u>Chamber of Commerce of the United States v. Lockyer</u>, the Ninth Circuit confronted a California statute forbidding employers who received a certain amount of state funds from using those funds to advocate for or against union organizing. 364 F.3d 1154 (9th Cir. 2004). The statute applied to all employers who accepted state grants in excess of $10,000, and it imposed separate accounting requirements on any business that either received state funds or entered into a contract with the state for more than $10,000. <u>Id.</u> at 1163. It also contained a provision for civil penalties and made employers subject to private civil suits. <u>Id.</u> Critically, the statutory restriction did not confine itself to state financing of projects employing workers who might be unionized. It affected employers in the use of state funds they had received for any reason. Analyzing the statutory language and its broad effect, the Ninth Circuit concluded:

---

insufficient to bring the case within <u>Boston Harbor</u>. We agree. In the real world, one can often plausibly contend that everything is related to everything else. We read the <u>Gould</u>/<u>Boston Harbor</u> distinction as requiring a much tighter fit between the procurement condition and the proprietary interest being advanced.

> The statute's scope indicates a general state position, not a narrow attempt to achieve a specific goal. Thus, there is no question that [the statute is] designed to have a broad social impact, by altering the ability of a wide range of recipients of state money to advocate about union issues.[6]

Id.; cf. Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir. 1999) (treating municipal decision to award single contract for towing as proprietary action exempt from preemption under federal motor carrier statute).

These cases confirm that whether a government's condition of funding constitutes market participation that falls within the Boston Harbor exception to preemption review depends upon the following two step test: First, does the challenged funding condition serve to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition "specifically tailored" to the proprietary interest? Boston Harbor, 507 U.S. at 232. If a condition of procurement satisfies these two steps, then it reflects the government's action as a market participant and escapes preemption review. But if the funding condition does not serve, or sweeps more broadly than, a government agency's proprietary economic interest, it must submit to review under labor law preemption standards. We think this test faithfully embodies the teachings of Gould and Boston Harbor, and is consistent with the approaches taken by our sister circuits.

---

[6] Lockyer cited the Ninth Circuit's earlier decision in Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406, 1415-16 (9th Cir. 1996), which held that the City of Oakland was not acting as a market participant when it canceled a newspaper subscription and refused to continue to pay for advertising during a labor dispute between the paper and its union. The Alameda Newspapers court held that the city was boycotting the paper, and hence acting as a market participant. This decision rests on an unusual set of facts, and its consistency with Boston Harbor and Golden State is debatable. Our reliance on Lockyer is not meant to imply, therefore, that we would agree with Alameda Newspapers.

15

See <u>Lockyer</u>, 364 F.3d at 1162 (quoting <u>Cardinal Towing</u>, 180 F.3d at 693); <u>Allbaugh</u>, 295 F.3d at 34-36.[7]

B

Is Ordinance 22 specifically tailored to advance or protect a proprietary financial interest of the City in the Fulton Building TIF District project? The best argument for Sage's challenge is as follows: The City has an economic interest in the success of the Fulton Building TIF District. But that interest is in the projected stream of increased tax revenue which the City hopes to receive if the project is successful. This kind of economic interest is governmental, not proprietary, because it is not comparable to the financial interest that an ordinary market participant has in a project. Rather, the City's interest is simply the traditional government interest in enhanced revenue that applies anytime the City seeks to increase its tax base.

If the foregoing were a complete description of the City's interest in the TIF project, Sage's objection would have considerable force. If we treated a public agency's bare interest in maximizing tax revenue as a proprietary interest, then preemption analysis would not apply to any state rule arguably designed to curtail labor strife that threatens to reduce corporate profits and, therefore, tax receipts. Expanding the concept of market participation to embrace so broad a concept of proprietary interest would render preemption law in this area a nullity.

_____

[7] The court in <u>Lockyer</u> arguably relied on evidence of the subjective motivation of the legislature in adopting the challenged statute, and also talked in terms of whether the state's behavior was proprietary "as measured by the similar behavior of private parties." 364 F.3d at 1163. We do not believe, however, that <u>Boston Harbor</u> and its progeny require a factual investigation into the particular subjective motives of the relevant government agency, or a survey of what private parties do in like circumstances. <u>Cf.</u> <u>Ky. W.V. Gas Co. v. Pa. Pub. Util. Comm'n</u>, 837 F.2d 600, 616 (3d Cir. 1988) (declining to look at legislators' motives in determining whether state provision violates federal Commerce Clause). We see the test as objective, based on the language and probable effect of the state ordinance or specification.

16

But that is not this case. Ordinance 22 is not designed simply to protect the City's interest in tax revenues. To be sure, as described above, under the TIF program, forty percent of any increased tax revenues flow to the City and other government entities. In this respect, the City's interest is nothing more or less than the traditional government interest in maximizing tax receipts. But the City is also a constituent in the URA—itself a public agency. In this capacity, the City is a partner in the proprietary interests of the URA itself. And the URA as issuer of the TIF bonds has a proprietary financial interest in the TIF development project that is the same as that of any (nonprofit) private entity that finances a development by issuing bonds.[8]

---

[8] Although not dispositive, see supra note 7, we note that the City itself perceived Ordinance 22 as an effort to protect its financial interests. Ordinance 22 reads, in pertinent part:

WHEREAS, The City of Pittsburgh has a *financial or proprietary interest* in certain capital projects which may include hospitality operations such as hotels . . . . It is anticipated that the revenues generated by these operations will be used in part to defray the public costs incurred in the construction and maintenance of such capital projects as well as to fund lease, rental or license payments to the City. *It is essential that these operations be conducted efficiently and without interruption and that no labor disputes affecting such operations may impact the revenues of other parts of such capital projects, which would in tern adversely affect the revenue stream to government.* The City has found that the efficient and uninterrupted operation of hospitality services may be threatened by labor disputes, and has found the only way to avoid this problem is by requiring Contractors and Employers of employees hired to staff hospitality operations to be signatory to collective bargaining agreements or other contracts under 29 U.S.C. sec. 185(a) with respect to the employees who will staff hospitality operations in capital projects . . . . Such contracts are the only method of insuring continuous provision of services under City contracts because under federal law, Employers may not unilaterally

Sixty percent of the tax revenues from the TIF are returned to the URA. Those revenues are applied to debt service and, if feasible, early retirement of the bonds. "Excess" revenues are applied by the URA to other development activities in the TIF district. Thus, the URA's interest in the success of the project that will yield the tax revenues is precisely that of any developer who is relying upon cash flow to support debt service, repay bonds, and finance other development. The Ordinance directly promotes and protects this interest. As in Boston Harbor, the Ordinance conditions funding on the employer entering into an agreement to eliminate picketing, work stoppages, and other economic disruptions.

This financial interest is similar, although not identical to, that of the City of San Francisco in Hotel Employees & Restaurant Employees Union, Local 2 v. Marriott Corp., No. C-89-2707, 1993 WL 341286 (N.D. Cal. Aug. 23, 1993). There, an agency of the City owned a piece of property that it wished to lease in part to a hotel in return for a percentage of gross proceeds. The District Court found that the requirement of certain labor agreements as an effective condition of the lease reflected a proprietary, not regulatory, interest on the part of the city, because the city "was acting as any private landowner would have in protecting a multimillion dollar real estate investment." Id. at *7. We find that reasoning apt here.

Ordinance 22 is not unduly broad in promoting and protecting the City's proprietary interest. The City's decision to insist that contractors and employers of staff hospitality employees sign no-strike agreements is specifically tailored to protect its proprietary interest in the value of the tax-revenue-generating property. Like the MWRA in Boston Harbor, the City has an interest in ensuring that labor strife does not damage the development. See Boston Harbor, 507 U.S. at 221 (upholding prehire agreement recommended by construction project manager to "maintain worksite harmony, labor-management peace, and overall stability throughout the duration of the project"); Allbaugh,

prohibit unions or their employees from engaging in work stoppages.
(App. 47 (emphasis added).)

18

295 F.3d at 35. Significantly, the requirement that an employer sign a labor agreement is limited to hotels and hospitality projects receiving TIF funds. (App. 47-49.) The City does not require that participating contractors sign labor agreements extending to non-TIF projects, which they may also be undertaking. Compare Chamber of Commerce of the United States v. Reich, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (order is regulatory when it touches on projects other than those that are government funded). Nor is this a situation in which the URA, having financed the project, has already retired its debt and therefore has no continuing interest in financial receipts from the TIF project.[9]

Given its considerable investment through the URA, the City acted as a reasonable investor in applying conditions to its multimillion dollar investment. Ordinance 22 is a specifically tailored response to a financial interest, given the income expected from the development and URA's position as the issuer of these and future securities. The Ordinance is therefore exempt from preemption review.[10]

C

Next, Sage charges that the Neutrality Agreement is void because it required Sage to provide "things of value" to the union

---

[9] In Marriott, the District Court distinguished the circumstance in which a city sells property to a developer outright on condition that the latter enters into a labor agreement. In that instance, because the city's economic interest would have terminated, the city's imposition of a labor agreement condition could not be characterized as protecting or furthering a proprietary interest. 1993 WL 341286, at *7. So, here, if the URA's interest were eliminated, the result might well be different.

[10] In its brief, Sage also states that it "would not have entered into the Agreement 'but for' the actions of the City and the consequent economic duress." (Appellant Br. at 4.) This argument is not briefed on appeal and so we will not address it. See Lunderstadt v. Colafella, 885 F.2d 66, 78 (3d Cir. 1989); Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 237 (3d Cir. 1987). In any event, as the District Court explained, the argument is without merit as Sage has not met the standard to prove economic duress.

in violation of section 302 of the LMRA.  That section provides, in pertinent part:

> (a) . . . . It shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
> (1) to any representative of any of his employees who are employed in an industry affecting commerce . . . .
> . . . .
> (2) to any labor organization, or any officer or employee thereof, which represents . . . any of the employees of such employer who are employed in an industry affecting commerce;
> (b) . . . . (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a).

29 U.S.C. § 186.

When Congress enacted section 302, it was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." Arroyo v. United States, 359 U.S. 419, 425-26 (1959) (footnotes omitted); see also Turner v. Local Union No. 302, Int'l Bhd. of Teamsters, 604 F.2d 1219, 1227 (9th Cir. 1979)  ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers."). In short, section 302 "was passed to address bribery, extortion and other corrupt practices conducted in secret."  Caterpillar Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., 107 F.3d 1052, 1057 (3d Cir. 1997) (en banc).

Not surprisingly, Sage is unable to provide any legal support for the remarkable assertion that entering into a valid labor agreement governing recognition of a labor union amounts to illegal labor bribery.  There are many reasons why this argument makes no sense, including the language of section 302 itself,

20

which proscribes agreements to "pay, lend, or deliver . . . any money or other thing of value."  The agreement here involves no payment, loan, or delivery of anything.  The fact that a Neutrality Agreement—like any other labor arbitration agreement—benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit.  Furthermore, any benefit to the union inherent in a more efficient resolution of recognition disputes does not constitute a "thing of value" within the meaning of the statute.  Cf. Wyman-Gordon Co. v. NLRB, 397 F.2d 394, 396 (1st Cir. 1968) (transmitting list of names and addresses to union for election purposes is not violation of § 302), rev'd on other grounds sub nom., NLRB v. Wyman-Gordon Co., 394 U.S. 759 (1969).

Apart from the plain language of section 302, the structure of other provisions of the labor law also militates against Sage's position.  Issues of labor-unit recognition and bargaining are comprehensively regulated by the NLRA.  Courts have repeatedly upheld labor-management agreements providing for arbitration over recognition disputes.  See, e.g., Hotel & Rest. Employees Union Local 217 v. J.P. Morgan Hotel, 996 F.2d 561 (2d Cir. 1993); Hotel Employees, Rest. Employees Union, Local 2 v. Marriott Corp., 961 F.2d 1464, 1468 (9th Cir. 1992).  Sage's interpretation of section 302 would wreak havoc on the carefully balanced structure of the laws governing recognition of and bargaining with unions.  Cf. Caterpillar, 107 F.3d at 1056-57 (declining to read section 302 as invalidating benefits obtained under lawful collective bargaining).

Finally, Sage suggests that it is improper to "sacrifice" the employees' right to an election by reaching an agreement to resolve any card count by arbitration. Sage concedes, however, as it must, that it lacks standing to assert employees' rights under the labor laws.  Accordingly, we do not reach this contention.[11]

For the foregoing reasons, we will affirm the judgment of

---

[11] Sage's remaining claim on appeal is that the City's passage of Ordinance 22 and Resolution 45 violated its Home Rule Charter.  Sage neglected to raise this affirmative defense in the District Court, and it is therefore waived.  Sys. Inc. v. Bridge Elecs. Co., 335 F.2d 465, 466 (3d Cir. 1964).

the District Court.