PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RONNIE ADCOCK; TIMOTHY
COCHRANE; THOMAS COCHRANE;
KATHERINE IVEY; KRISTI JONES,
        *Plaintiffs-Appellants,*

v.

FREIGHTLINER LLC; INTERNATIONAL
UNION, UNITED AUTOMOBILE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA,
        *Defendants-Appellees.*

No. 06-2287

NATIONAL LABOR RELATIONS
BOARD,
        *Amicus Curiae.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:06-cv-00032)

Argued: October 28, 2008

Decided: December 23, 2008

Before TRAXLER and KING, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Senior Judge Hamilton wrote
the opinion, in which Judge Traxler and Judge King joined.

## COUNSEL

**ARGUED:** William L. Messenger, NATIONAL RIGHT TO WORK LEGAL FOUNDATION, Springfield, Virginia, for Appellants. William Lawrence Rikard, Jr., PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina; Stephen P. Berzon, ALTSHULER & BERZON, San Francisco, California, for Appellees. **ON BRIEF:** Philip M. Van Hoy, Stephen Dunn, VAN HOY, REUTLINGER, ADAMS & DUNN, Charlotte, North Carolina, for Appellants. Eric D. Welsh, Kristin R. Poolos, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Charlotte, North Carolina, for Appellee Freightliner LLC. Danielle Leonard, ALTSHULER & BER-ZON, San Francisco, California; George N. Davies, NAKA-MURA, QUINN & WALLS, Birmingham, Alabama; Daniel W. Sherrick, General Counsel, Jeffrey D. Sodko, Associate General Counsel, INTERNATIONAL UNION, UAW, Detroit, Michigan; Seth Cohen, SMITH, JAMES, ROWLETT & COHEN, L.L.P., Greensboro, North Carolina, for Appellee International Union, United Automobile and Agricultural Implement Workers of America. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Margery E. Lieber, Deputy Associate General Counsel, Eric G. Moskowitz, Assistant General Counsel, Laura Bandini, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Amicus Curiae.

---

## OPINION

HAMILTON, Senior Circuit Judge:

With certain exceptions not applicable in this case, § 302 of the Labor Management Relations Act (LMRA) prohibits, among other things, an employer from "pay[ing], lend[ing], or deliver[ing] . . . any money or other thing of value" to a labor

union or labor union representative. 29 U.S.C. § 186(a). The issue presented in this appeal is whether Freightliner LLC (Freightliner) delivered "money or other thing[s] of value" to the International Union, United Automobile and Agricultural Implement Workers of America (the Union) pursuant to a card check agreement with the Union, wherein Freightliner agreed, among other things, to: (1) require some of its employees to attend, on paid company time, Union presentations explaining the card check agreement; (2) provide the Union reasonable access to nonwork areas in company plants to allow Union representatives to meet with employees; and (3) refrain from making negative comments about the Union during organizing campaigns. For the reasons stated below, we conclude that the district court correctly determined that Freightliner did not deliver a "thing of value" to the Union in violation of § 302. Accordingly, we affirm.

I

A

Freightliner owns several production facilities in North Carolina, including the Mt. Holly Truck Manufacturing Plant (Mt. Holly), the Gastonia Parts Manufacturing Plant (Gastonia), the Cleveland Truck Manufacturing Plant (Cleveland Truck), the Cleveland Parts Distribution Center (Cleveland Parts), the Thomas Built Buses Manufacturing Plant (Thomas Built), and the Freightliner Custom Chassis Manufacturing Plant (Custom Chassis). As of March 2002, the Union was the exclusive bargaining representative only of the employees at Mt. Holly. Around this time, the Union sought to organize and become the exclusive bargaining representative of the employees at Freightliner's other facilities in North Carolina, which were nonunion.

Negotiations between Freightliner and the Union ensued, which resulted in the signing of two agreements in December 2002. The first agreement (the Card Check Agreement) out-

lined the ground rules for the organizing campaigns. In the Card Check Agreement, Freightliner agreed with respect to each bargaining unit to forego a National Labor Relations Board election if a majority of the bargaining unit employees chose the Union as their exclusive bargaining representative by signing authorization cards. As part of the Card Check Agreement, Freightliner also agreed to: (1) require some of its employees to attend, on paid company time, Union presentations explaining the Card Check Agreement; (2) provide the Union reasonable access to nonwork areas in company plants to allow Union representatives to meet with employees; and (3) refrain from making negative comments about the Union during the organizing campaigns.[1]

The second agreement signed by the parties was a precon-

---

[1]Typically, a "card check" or "neutrality" agreement is an agreement between the employer and the union "in which they agree that (a) the employer will not speak for or against the union (neutrality) and/or (b) the employer will recognize the union if it can get signed authorization cards from a majority of the unit members (card-check)." Matthew T. Bodie, *The Market for Union Services: Reframing the Debate*, 94 Va. L. Rev. In Br. 23, 26-27 (2008). Neutrality agreements have been upheld by this and other courts. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Facetglas, Inc.*, 845 F.2d 1250, 1253 (4th Cir. 1988) (holding neutrality and nondiscrimination provisions of election agreement enforceable under § 301 of the LMRA as "an agreement between an employer and a labor organization significant to the maintenance of labor peace between them") (citation and internal quotation marks omitted); *see also AK Steel Corp. v. United Steelworkers*, 163 F.3d 403, 406 (6th Cir. 1998) (upholding agreement preventing an employer from "demean[ing] the Union as an organization or its representatives as individuals" and interpretation preventing anti-union communication by employer); *Hotel & Rest. Employees Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 563 (2d Cir. 1993) (upholding agreement preventing an employer from interfering with union organizing effort or mounting a campaign with its employees opposing the union). Like the Card Check Agreement in this case, card check agreements typically include a provision allowing the union "access to the employer's physical property." James J. Brudney, *Neutrality Agreements and Card Check Recognition: Prospects for Changing Paradigms*, 90 Iowa L. Rev. 819, 826 (2005).

ditions agreement (the Preconditions Agreement). In the Preconditions Agreement, the Union made commitments as to its conduct if it were recognized as the exclusive bargaining representative of Freightliner's employees. Notably, the Union agreed that: (1) there would be "separate consideration in terms and conditions of employment for each Business Unit because of industry differences (trucks, parts, busses, fire and rescue, chassis) including competitive wage and benefits packages within comparative product markets"; (2) there would be "no guaranteed employment or transfer rights between Business Units or Plants"; (3) there would be "no provisions for severance pay . . . in the event of a layoff or plant closure"; (4) there would be "no strikes during the term of any collectively bargained agreement"; (5) there would be "no subcontracting prohibitions, provided economics reflect non-competitiveness"; (6) future "benefits cost increases, in excess of normal inflation, will be shared between the Company and the employees proportionately at a rate to be determined between the Company and its employees"; and (7) in consideration of Freightliner's financial turnaround objectives, there would be "no wage adjustments provided at any newly organized facility prior to mid-2003." (J.A. 17-18).

The ensuing organizing campaigns at Gastonia, Cleveland Truck, and Cleveland Parts resulted in the Union becoming the exclusive bargaining representative at these facilities in the first part of 2003. In June 2003, Freightliner and the Union, on behalf of the Mt. Holly employees, entered into a collective bargaining agreement (CBA), which provided, among other things, that: (1) there would be no increase in employee wages for the first three years of the CBA; (2) the employees' profit sharing bonus would be canceled; and (3) the employees would increase their share of employee benefit payments. In December 2003, Freightliner and the Union, on behalf of the employees at the Gastonia, Cleveland Truck, and Cleveland Parts facilities, entered into CBAs.

In March 2004, a majority of the employees at Thomas Built signed authorization cards choosing the Union as their

exclusive bargaining representative. Consequently, Freightliner recognized the Union as the exclusive bargaining representative of these employees. On April 14, 2004, Jeff Ward, a Thomas Built employee, filed unfair labor practice charges against the Union and Freightliner. After reviewing these charges, General Counsel for the NLRB issued a complaint on October 13, 2004 alleging that Freightliner and the Union violated the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, by "bargaining and entering into an agreement regarding employee terms and conditions of employment prior to the [Union] enjoying the support of a majority of employees." (J.A. 29). The complaint also alleged that Freightliner violated the NLRA by assisting the Union with the solicitation of union authorization cards from employees at Thomas Built and by recognizing the Union at Thomas Built when, in fact, the Union did not represent "an uncoerced majority of employees." (J.A. 29).

On March 17, 2005, the NLRB, the Union, and Freightliner settled the unfair labor practice charges filed by General Counsel for the NLRB. The terms of the settlement agreement included that: (1) Freightliner and the Union would cease giving effect to the Preconditions Agreement at all Freightliner facilities; (2) Freightliner would cease assisting the Union with the solicitation of union authorization cards from employees at Thomas Built; and (3) Freightliner would not recognize the Union at Thomas Built unless the Union was "certified by the NLRB." (J.A. 30).

B

On January 24, 2006, four employees of Gastonia and one employee of Cleveland Truck filed this class action against Freightliner and the Union in the United States District Court for the Western District of North Carolina. The complaint alleged four claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. The racketeering activity alleged in each of the four counts con-

sists of violations of § 302 of the LMRA.[2] According to the complaint, Freightliner violated § 302 when it: (1) required some of its employees to attend on paid company time Union presentations explaining the Card Check Agreement; (2) provided the Union reasonable access to nonwork areas in company plants to allow Union representatives to meet with employees; and (3) agreed to refrain from making negative comments about the Union during the organizing campaigns. The complaint also alleges that the Union violated § 302 when it agreed to receive these alleged benefits. The five employees (the Employees), for themselves and a proposed class of Freightliner employees, sought damages for the wages, benefits, and other terms of employment for which they allegedly were deprived as a result of the alleged racketeering activity. The Employees also sought damages for the dues that Freightliner's employees paid to the Union because they allegedly never received loyal collective bargaining representation. Finally, the Employees sought treble damages under 18 U.S.C. § 1964(c).

On November 9, 2006, the district court dismissed the complaint for failure to properly allege a § 302 violation. *See* Fed. R. Civ. P. 12(b)(6). According to the district court, the complaint did not set forth allegations demonstrating that Freightliner delivered "'things of value'" to the Union. (J.A. 62). The Employees noted this timely appeal.

## II

The Employees contend that the district court erred when it determined that their complaint did not properly allege a § 302 violation. Our review of the district court's Rule 12(b)(6) dismissal is *de novo*. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991). In conducting this review, we construe the factual allegations of the complaint "in the light most

---

[2]A violation of § 302 is one of the enumerated predicate racketeering activities in the RICO statute. 18 U.S.C. § 1961(1)(c).

favorable to plaintiff." *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060, 1062 (4th Cir. 1984). However, we are not bound by the legal conclusions drawn in the complaint. *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007), and the complaint must have "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

With certain exceptions not applicable in this case, § 302 of the LMRA prohibits, among other things, an employer from "pay[ing], lend[ing], or deliver[ing], or agree[ing] to pay, lend, or deliver, any money or other thing of value" to a labor union or a representative of such union. 29 U.S.C. § 186(a). With these same inapplicable exceptions, the statute also prohibits a labor union or union representative from receiving or accepting "any money or other thing of value" from an employer. *Id.* § 186(b). According to the Employees, Freightliner delivered "thing[s] of value" to the Union when it agreed to: (1) require some of its employees to attend, on paid company time, Union presentations explaining the Card Check Agreement; (2) provide the Union reasonable access to non-work areas in company plants to allow Union representatives to meet with employees; and (3) refrain from making negative comments about the Union during the organizing campaigns. As the Employees' argument goes, because these concessions made by Freightliner benefited the Union's organizing efforts, they were "thing[s] of value" under § 302, because a "thing of value" means anything that has subjective value to the Union.

We agree with the district court that Freightliner did not deliver "thing[s] of value" to the Union, as the phrase "thing[s] of value" is used in § 302. First, the plain language of the statute does not support the Employees' position. In determining the meaning of a statute, we examine the statute's plain language. *United Seniors Ass'n, Inc. v. Social Sec.*

*Admin.*, 423 F.3d 397, 402 (4th Cir. 2005). In doing so, we look at "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Under the plain language of the statute, the concessions made by Freightliner in the Card Check Agreement do not involve the payment or delivery of a "thing of value." The concessions provided by Freightliner all involve permitting the Union access to employees during an organizing campaign. Such concessions do not involve the delivery of either tangible or intangible items to the Union. A vacuum salesman who is permitted by a company to make a sales pitch to employees does not receive a thing of value from the company. So, too, is the case of a company that allows a union access to its employees during an organizing campaign. In such situations, no "thing[s] of value" are delivered by the company. Rather, all that is involved is the establishment of mutually acceptable ground rules, for the sales pitch in the case of the vacuum salesman, and the organizing campaign in the case of the union.

Our reading of the statute is consistent with the purposes of § 302. The Supreme Court has noted that § 302 was enacted to curb abuses that Congress felt were "inimical to the integrity of the collective bargaining process." *Arroyo v. United States*, 359 U.S. 419, 425 (1959). In particular, Congress was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." *Id.* at 425-26 (footnotes omitted); *see also Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219, 1227 (9th Cir. 1979) ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers."). Thus, § 302 is aimed at preventing "bribery, extortion and

other corrupt practices conducted in secret." *Caterpillar, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 107 F.3d 1052, 1057 (3d Cir. 1997) (*en banc*).

In this case, the concessions made by Freightliner do not involve bribery or other corrupt practices. By no stretch of the imagination are the concessions a means of bribing representatives of the Union; indeed, no representative of the Union personally benefited from these concessions. Rather, the concessions serve the interests of both Freightliner and the Union, as they eliminate the potential for hostile organizing campaigns in the workplace. In this sense, the concessions certainly are not inimical to the collective bargaining process.

Our interpretation of the phrase "thing of value" also is buttressed by § 302's penalty provision. Under § 302's penalty provision, the severity of the sentence is dictated by the monetary value of the thing delivered by the employer or received by the union. A person who willfully violates § 302 is guilty of a felony unless the value of the money or thing involved does not exceed $1,000, in which case the person is guilty of a misdemeanor. Thus, Congress clearly intended § 302's "thing of value" to have at least some ascertainable value. In this case, unquestionably, the concessions made by Freightliner, which simply involved allowing the Union access to Freightliner's employees, have no such whatsoever.[3]

We also note that our reading of § 302 is consistent with a decision on similar facts from the Third Circuit. In *Hotel Employees & Rest. Employees Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, (3d Cir. 2006), an employer and a labor union signed an agreement which contained a

---

[3]Because the concessions made by Freightliner have no ascertainable value, we need not decide the extent to which intangible items may have value under § 302 or any other criminal statute prohibiting the delivery, conveyance, or acceptance of a "thing of value."

series of provisions, including one that provided for a card check procedure, whereby the union would present cards requesting union representation signed by a majority of the employer's employees and the employer would provide a current list of employees and valid signature samples. *Id.* at 209. One of the arguments raised on appeal by the employer was that the agreement was void because it required the employer to deliver "thing[s] of value" to the union in violation of § 302. *Id.* at 218. In rejecting this argument, the court noted:

> Not surprisingly, Sage is unable to provide any legal support for the remarkable assertion that entering into a valid labor agreement governing recognition of a labor union amounts to illegal labor bribery. There are many reasons why this argument makes no sense, including the language of section 302 itself, which proscribes agreements to "pay, lend, or deliver . . . any money or other thing of value." The agreement here involves no payment, loan, or delivery of anything. The fact that a Neutrality Agreement—like any other labor arbitration agreement—benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit. Furthermore, any benefit to the union inherent in a more efficient resolution of recognition disputes does not constitute a "thing of value" within the meaning of the statute.

*Id.* at 219. We agree with the Third Circuit that an agreement setting forth ground rules to keep an organizing campaign peaceful does not involve the delivery of a "thing of value" to a union.

The Employees' real beef in this case seems to be with the concessions made by the Union in the Preconditions Agreement. However, the Union's concessions in the Preconditions Agreement do not bring § 302 into play, because § 302 only prevents employers from delivering (and the union or union

representatives from accepting or receiving) "thing[s] of value." Pursuant to the Preconditions Agreement, Freightliner did not deliver anything to the Union, and the Union did not extort anything.

With that said, it is important to note that adequate remedies under the NLRA are available to employees, allowing them to challenge agreements similar to the two agreements in this case, though the available remedies do not include the treble damages that are available under RICO. Sections 8(a)(2) and 8(b)(1)(A) of the NLRA, 29 U.S.C. §§ 158(a)(2) and (b)(1)(A), prohibit, in certain circumstances, the negotiation of a CBA establishing wages, fringe benefits, and other terms and conditions of employment before the union receives the support of a majority of bargaining unit employees. The NLRA also separately prohibits employers from improperly coercing employees with regard to their right to choose or reject union representation. *See id.* §§ 158(a)(1) and (2).[4] In

---

[4]The NLRB, as well as this court, has held that allowing unions to address employees on company property and company time does not, without some further evidence of coercion, violate the NLRA. *See Tecumseh Corrugated Box Co.*, 333 NLRB 1, 6 (2001) ("As to Tecumseh's conduct in allowing the Teamsters to address its employees on company time and property, the Board has long held that such conduct, without more, does not amount to unlawful assistance within the meaning of section 8(a)(2) of the Act."); *Longchamps, Inc.*, 205 NLRB 1025, 1031 (1973) ("[T]he use of company time and property does not, *per se*, establish unlawful employer support and assistance."); *see also Kimbrell v. NLRB*, 290 F.2d 799, 802 (4th Cir. 1961) ("The petitioners stress particularly the circumstances that the employer gave permission to the union to address the employees during working hours, for which the employees were paid, and that the employer accepted the card check without a formal election as evidence of the majority choice of the union and speedily negotiated a union contract. These are of course circumstances to be taken into account in making an ultimate finding but they are not conclusive, for it has been frequently held that they do not constitute per se violations of the statute in the absence of coercion, interference or restraint."). The fact intensive inquiry conducted by the NLRB to resolve access issues under the NLRA

this case, unfair labor practice charges containing such allegations concerning Thomas Built were, in fact, filed against Freightliner and the Union and were settled to the satisfaction of the NLRB. The availability of such adequate remedies severely undermines the Employees' attempt to stretch § 302 beyond its limits. We simply cannot apply § 302 in a manner inconsistent with both the statute's plain language and Congress' intent in passing the statute.

### III

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

---

can lead to different results depending on the circumstances presented. *Compare Vernitron Elec. Components, Inc.*, 221 NLRB 464, 465 (1975) (finding access amounted to unlawful assistance) with *Tecumseh Corrugated Box Co.*, 333 NLRB at 6 (dismissing complaint alleging improper access).