**BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL–CIO, et al., Appellees,**

v.

**Joe ALLBAUGH, Director, Federal Emergency Management Agency, et al., Appellants.**

No. 01–5436.

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 2002.

Decided July 12, 2002.

Mark B. Stern, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Roscoe C. Howard Jr., U.S. Attorney, Gregory G. Katsas, Deputy Assistant Attorney General, U.S. Department of Justice, Alisa B. Klein and Ara B. Gershengorn, Attorneys.

Jerry W. Kilgore, Attorney General, State of Virginia, Roger L. Chaffe, Senior Assistant Attorney General and Chief, and William E. Thro, Special Assistant Attorney General, were on the brief for amicus curiae Commonwealth of Virginia in support of appellants.

Stephen A. Bokat, Maurice Baskin and Glenn Taubman were on the brief for amici curiae Chamber of Commerce of the United States, et al. in support of appellants.

Victoria L. Bor argued the cause for appellees. With her on the brief were Laurence J. Cohen, Terry R. Yellig, Michael B. Roger and Sandra Benson.

John Gaal and Arnon D. Siegel were on the brief for amicus curiae New York Thruway Authority in support of appellees.

Albert H. Meyerhoff, Stanley S. Mallison, Stephen J. Burton, David L. Hashmall, Gary L. Lieber, Katherine Brewer and Jonathan Cuneo were on the brief for amici curiae Sierra Club, et al. in support of appellees.

Eliot Spitzer, Attorney General, State of New York, Seth Kupferberg, Assistant Attorney General, Bill Lockyer, Attorney General, State of California, Manuel M. Medeiros, State Solicitor General, J. Joseph Curran Jr., Attorney General, State of Maryland, Thomas F. Reilly, Attorney General, Commonwealth of Massachusetts, were on the brief for amici curiae State of New York, et al. in support of appellees.

Before: GINSBURG, Chief Judge, and RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

Executive Order No. 13,202 provides that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a project labor agreement (PLA). The plaintiffs — the Building and Construction Trades Department of the AFL–CIO (BCTD), the Contra Costa Building and Construction Trades Council (BCTC), and the City of Richmond, California — brought this suit to challenge the validity of the Executive Order. The district court held the Executive Order invalid and enjoined its enforcement.

We hold that the President had authority under Article II of the Constitution of the United States to issue Executive Order No. 13,202, and that the Executive Order is not preempted by the National Labor Relations Act. Therefore, we reverse the judgment of the district court and vacate the injunction.

## I. Background

A PLA is a multi-employer, multi-union pre-hire agreement designed to systemize labor relations at a construction site. It typically requires that all contractors and subcontractors who will work on a project subscribe to the agreement; that all contractors and subcontractors agree in advance to abide by a master collective bargaining agreement for all work on the project; and that wages, hours, and other terms of employment be coordinated or standardized pursuant to the PLA across the many different unions and companies working on the project. The implementation of a PLA on a project underwritten by the Government almost always is accomplished by making agreement to the PLA a bid specification, thereby allowing the contracting authority to ensure that firms at every level — from the general contractor to the lowest level of subcontractor — comply with the terms of the PLA.

President George W. Bush issued Executive Order No. 13,202 on February 17, 2001, establishing the policy of the Government with regard to the use of PLAs in federal and federally funded construction contracts. *See* Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, 66 Fed. Reg. 11,225 (Feb. 22, 2001) (Executive Order). The Executive Order provides that the Government will neither require nor prohibit the use of a PLA on any federal or federally funded construction project. Section 1(a) provides that, "[t]o the extent permitted by law," no federal agency or construction manager acting on its behalf shall "in its bid specifications, project agreements, or other controlling documents" for a construction project "[r]equire or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations, on the same or other related project(s)." Section 3 applies the same prohibition to "any executive agency issuing grants, providing financial assistance, or entering into cooperative agreements for construction projects." The Executive Order makes clear that it does not prohibit a contractor or a subcontractor from entering into a PLA, *see id.* § 1(c); it merely prevents the contracting authority from either requiring or forbidding the use of a PLA for a project. The result in practice is to leave to the contractors working on a project the choice whether to enter into, and to require their subcontractors to enter into, a PLA, presumably depending upon whether it is likely to increase or to decrease their costs. *See, e.g.,* UNITED STATES GENERAL ACCOUNTING OFFICE, PROJECT LABOR AGREEMENTS, THE EXTENT OF THEIR USE AND RELATED INFORMATION, GAO/GGD–98–82 (May 1998) 9 (describing instructions for bidders issued by Department of Labor allowing, but not requiring, "a responsive bidder [to] have a Project Labor Agreement (PLA) with its contractors" because a "PLA is one possible method of meeting th[e] goal" of ensuring good labor relations).

The plaintiffs brought suit in the district court to enjoin enforcement of the Executive Order, naming as defendants the Director of the Federal Emergency Management Agency, the Secretary of Housing and Urban Development, the Secretary of Transportation, and the members of the Federal Acquisition Regulatory Council. The BCTD, which consists of 14 national labor organizations representing workers in the construction industry, averred that it and its affiliates had entered into and intended to negotiate many PLAs, the future availability of which would be affected directly by the Executive Order. The City of Richmond alleged that the Executive Order prevented it from requiring the use of PLAs on several federally funded con-

struction contracts lest it lose its access to federal funds. The BCTC, which consists of 27 local labor unions representing construction workers in Contra Costa County, California, claimed in turn that but for the Executive Order it would negotiate PLAs with respect to work on federally funded projects put out for bid by the City of Richmond.

One of the projects for which the BCTD had negotiated a PLA was the Woodrow Wilson Bridge Construction Project, the purpose of which is to replace a drawbridge over the Potomac River. The Congress, after transferring ownership of the existing bridge to an interstate authority established by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia, appropriated more than $1.5 billion for the project. *See* Woodrow Wilson Memorial Bridge Authority Act of 1995, Pub. L. No. 104–59, tit. IV, §§ 405, 410, 109 Stat. 568, 629, 633–34 (1995). Maryland took responsibility for building the structures crossing the Potomac River and the highways and interchanges on the Maryland side, and Virginia agreed to build the highways and interchanges on the Virginia side of the River. Before the President issued Executive Order No. 13,202 affiliates of the BCTD and the construction manager for the Maryland State Highway Administration entered into an agreement to set terms for the construction of Maryland's share of the project.

The agreement provided that Maryland would incorporate a PLA into its bid specifications and that the successful bidder for the project would be bound by the PLA regardless whether the contractor's employees were members of a union. As required by federal regulations, *see* 23 C.F.R. §§ 630.205(e), 635.104(a), 635.112(a), Maryland submitted the bid specifications to the Federal Highway Administration (FHWA) for approval, but the

FHWA rejected them because the newly issued Executive Order prohibited the State from requiring adherence to a PLA. Maryland later awarded the contract without requiring that the awardee enter into a PLA, which left the BCTD no role in the project.

Upon application of the BCTD, the district court issued a preliminary injunction "prohibiting the defendants from enforcing the Executive Order against the Wilson Bridge PLA." *Bldg. & Constr. Trades Dep't v. Allbaugh,* 172 F.Supp.2d 67, 79 (2001). The court held that the Executive Order conflicts with the National Labor Relations Act, 29 U.S.C. § 151 *et seq.,* and that without an injunction the BCTD would suffer irreparable harm because "before the Executive Order was put in place ... [the] BCTD had negotiated an agreement, binding on Maryland, and Maryland was using its best efforts to implement it," 172 F.Supp.2d at 79.

A few weeks later the district court issued a permanent injunction against enforcement of the Executive Order. The court held first that, pursuant to the reasoning of the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the President could not impose the conditions in § 3 of the Executive Order upon the administration of federal funds without the express authorization of the Congress, *See Bldg. & Constr. Trades Dep't v. Allbaugh,* 172 F.Supp.2d 138, 160 (2001), and that neither the Federal Property and Administrative Services Act, 40 U.S.C. § 471 *et seq.* (Procurement Act), nor any other statute authorizes the President to do so, *see id.* at 162. The district court next concluded that the Executive Order was preempted in its entirety by the NLRA because the Executive Order would abridge rights granted in § 8 of the Act to employers in the construction industry and would "alter

the delicate balance of bargaining and economic power that the NLRA establishes." *See id.* at 167, 169 (quoting *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1337 (D.C.Cir.1996)).

## II. Analysis

The Government appeals, contending that under Article II of the Constitution the President has authority to impose the conditions in § 3 of the Executive Order, and that the Executive Order is a proprietary rather than a regulatory act and therefore not subject to preemption by the NLRA. We address these questions of law de novo. *See Time Warner Entm't Co. v. United States,* 211 F.3d 1313, 1316 (D.C.Cir.2000).

## A. The Constitution and the Executive Order

■ The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown,* 343 U.S. at 585, 72 S.Ct. 863. In this case the district court assumed without deciding (because the plaintiffs had not argued to the contrary) that § 1 of the Executive Order, which section "involves contracting by federal agencies, ... is arguably authorized by the Procurement Act," 172 F.Supp.2d at 159 & n. 9, but the court went on to "invalidate § 3 of EO 13202 as an action beyond the scope of the President's authority," *id.* at 162. The Government contends on appeal that in so ruling, "the district court fundamentally misunderstood the President's authority as head of the executive branch." The first question before us, therefore, is whether the President had constitutional authority to issue § 3 of the Executive Order, which section applies to "any agency issuing grants, providing financial assistance, or entering into cooperative agreements for construction projects."

■ Article II, § 1 of the Constitution provides that the "executive Power shall be vested in a President of the United States of America." As the Government observes, the President's power necessarily encompasses "general administrative control of those executing the laws," *Myers v. United States,* 272 U.S. 52, 164, 47 S.Ct. 21, 71 L.Ed. 160 (1926), throughout the Executive Branch of government, of which he is the head. The authority of the President is not without limits, of course: "the President's power [under Article II, § 3] to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown,* 343 U.S. at 587, 72 S.Ct. 863. His faithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates. As we previously have had occasion to observe:

> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone.

*Sierra Club v. Costle,* 657 F.2d 298, 406 n. 524 (D.C.Cir.1981). Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law. *See* THE FEDERALIST No. 72, at 463 (Alexander Hamilton) (Benjamin F. Wright ed., 1961) ("The persons, therefore, to whose immediate management these different matters are committed, ought to be considered as the assistants or deputies of the chief mag-

istrate ... and ought to be subject to his superintendence").

 Section 3 of Executive Order No. 13,202 is such an exercise of the President's supervisory authority over the Executive Branch. In the Executive Order, the President directs his subordinates how to proceed in administering federally funded projects, but only "[t]o the extent permitted by law." Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law.

The district court's comparison of Executive Order No. 13,202 to the executive order by which President Truman purported to seize privately owned steel mills, and which the Supreme Court declared unlawful in *Youngstown*, is misplaced because the present Executive Order is not selfexecuting. As the Government says; the question in the earlier case was whether the President had constitutional authority to seize the mills and not, as here, whether he could direct Executive Branch officials in their implementation of statutory authority. Indeed, had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel "[t]o the extent permitted by law," *Youngstown* would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did.

The plaintiffs raise the prospect that, notwithstanding the President's instruction that the Executive Order be applied only "[t]o the extent permitted by law," a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute. We express no opinion upon whether this may come to pass. The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration. *See Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (to prevail in facial attack, complainant must "establish that no set of circumstances exists under which the [regulation] would be valid") (brackets in original). In the event that an agency does contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision.

Nonetheless, the plaintiffs complain that it is "untenable to require each federal grantee or other potential party to a PLA to challenge a threatened denial of funds based on the Executive Order" because "projects are planned and conducted on tight and critical timeframes." That concern, however, provides us with no warrant to relieve the plaintiffs of their burden in this facial challenge to show that § 3 of the Order is without any valid application. *See Flores*, 507 U.S. at 301, 113 S.Ct. 1439. Nor is there reason to be concerned for "each federal grantee"; a single judicial determination that an agency lacks authority to implement the Executive Order in its administration of a particular statute is likely to settle any questions about the application of the Executive Order to later grants of federal funds pursuant to that statute. Insofar as the plaintiffs are concerned that "there is rarely time to litigate an agency's rejection of a bid specification, or to challenge a threat that funding will be withheld," the Govern-

ment correctly points out that the plaintiffs "offer no reason to think that the usual mechanisms for seeking expedited review would be inadequate" to provide redress where appropriate. *See, e.g.,* 4 C.F.R. § 21.10 (2002) (Comptroller General may resolve dispute "using an express option" or other "flexible alternative procedures").

## B. The Executive Order and the NLRA

The district court held that because "[p]rivate entities are being prohibited . . . from requiring PLAs that are expressly allowed by the NLRA," the NLRA preempts § 3 of the Executive Order insofar as it applies to "private recipients of federal funding who act as employers in construction projects," 172 F.Supp.2d at 167 (citing *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). In that case, the Supreme Court held that when "the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Id.* at 244, 79 S.Ct. 773. The district court also held that because the Executive Order "impermissibly attempts to create an ideally balanced state of bargaining according to the President's conception of open competition among labor and management," *BCTD,* 172 F.Supp.2d at 167, the NLRA preempts the Executive Order under the teaching of *International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commis-*

*sion,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In that case the Court held that neither a state government nor the National Labor Relations Board may regulate an aspect of labor relations that the Congress intended "be controlled by the free play of economic forces." *Id.* at 140, 96 S.Ct. 2548.*

■ The Government argues that we need not determine whether the Executive Order runs afoul of the principles established in *Garmon* and *Machinists* because "Executive Order 13202 clearly constitutes proprietary action rather than regulation." We agree.

■ As the plaintiffs expressly recognize, the principles of NLRA preemption come into play only when the Government is "regulating within a protected zone," and not when it is acting as a proprietor, "interact[ing] with private participants in the marketplace." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors,* 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (*Boston Harbor*). The relevant distinction is whether, in placing a labor-related condition upon its award either of a construction contract or of funds to another entity that will award the construction contract, the Government "acts just [as] a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find," *id.* at 233, 113 S.Ct. 1190, or instead seeks to affect conduct "unrelated to the employer's performance of contractual obligations to the [Govern-

---

* The Government contends that the "legal principles developed to govern federal-state relations are ill-suited to cases such as this, which involve relations between two branches of the federal government." Whatever the merit of that argument, this court on at least one occasion has applied the doctrine "to federal government behavior that is thought similarly to encroach into the NLRA's regulatory territory," and specifically to an executive order. *Chamber of Commerce,* 74 F.3d at 1335. As the Government recognizes, the panel is bound to abide by that precedent unless it is overturned by the court sitting en banc or by the Supreme Court.

ment]," *id.* at 229, 113 S.Ct. 1190; *accord, Chamber of Commerce,* 74 F.3d at 1335.

As the Government maintains, § 1 of the Executive Order embodies just "the type of decision regarding the use of labor agreements that a private project owner would be free to make." The construction proviso of the NLRA, 29 U.S.C. § 158(f), "explicitly permits employers in the construction industry ... to enter into pre-hire agreements," *Boston Harbor,* 507 U.S. at 230, 113 S.Ct. 1190, but nothing in that proviso prevents an employer from refusing to enter into such agreements. Thus, § 1 leaves contractors free to determine whether they will use PLAs on government contracts, just as they may determine whether to use PLAs on projects for private owner-developers that neither require nor prohibit their use.

The plaintiffs argue that at least § 3 of the Executive Order is regulatory rather than proprietary because it applies only to federally funded rather than to Government-owned projects; but that argument proceeds from too crabbed an understanding of proprietorship. First, the Government unquestionably is the proprietor of its own funds, and when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity. Second, that the Government is a lender to or a benefactor of, rather than the owner of, a project is not inconsistent with its acting just as would a private entity; a private lender or benefactor also would be concerned that its financial backing be used efficiently. In sum, the distinction between federally owned and federally funded projects is not relevant here.

The plaintiffs also contend that "when the Government acts through blanket, across-the-board rules that 'flatly prohibit' ... certain actions on the part of its contractors and recipients of its financial assistance, its conduct is clearly regulatory,"

whereas it acts in a proprietary capacity when it makes an "ad hoc" contracting decision. According to the plaintiffs, this distinction finds support in *Chamber of Commerce,* 74 F.3d at 1337 (observing Executive Order No. 12,954 "cannot be equated to the *ad hoc* contracting decision made by [the State] in seeking to clean up Boston Harbor"); but the plaintiffs misread that case, as did the district court, *see BCTD,* 172 F.Supp.2d at 170 ("EO 13202 sets a blanket rule and does not require government agencies to act on a project–by-project basis, as was the case in *Boston Harbor*"). In *Chamber of Commerce,* we held that Executive Order No. 12,954 was regulatory not because it decreed a policy of general application, as opposed to a case-by-case regime, but because it disqualified companies from contracting with the Government on the basis of conduct unrelated to any work they were doing for the Government. *See* 74 F.3d at 1338 (executive order "ha[d] the effect of forcing corporations wishing to do business with the federal government not to hire permanent replacements even if the strikers are not the employees who provide the goods or services to the government"). It is not surprising, therefore, that neither the district court nor the plaintiffs offer any good explanation why a "blanket rule" — applicable to all government contracts, but not to the non-government contracts of those who do business with the Government — is somehow inconsistent with the action of a proprietor. We agree with the Government that there simply is "no logical justification" for holding that "if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as [a] market participant." *See Kahn,* 618 F.2d at 789 (under Procurement Act, President may exercise "authority over those larger

administrative and management issues that involve the Government as a whole").

 A condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it "addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government]." 507 U.S. at 228–29, 113 S.Ct. 1190. Here the Government correctly notes that "the impact of [the] procurement policy [expressed in Executive Order No. 13,202] extends only to work on projects funded by the government." Because the Executive Order does not address the use of PLAs on projects unrelated to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as "regulatory."

Finally, the plaintiffs point out that § 1(a) of the Executive Order could be read to prohibit any recipient of federal funds from using a PLA for work on "related construction project(s)" that are not funded by the Government. The meaning of the word "related" in § 1(a) is indeed unclear. The plaintiffs argue that as a result the Executive Order "cannot fairly be characterized as affecting only the particular contract in which the Government has a financial interest." When confronted with this reading, however, the Government disavowed any construction of the Executive Order that would prohibit an entity that uses a PLA in a non-federally funded project from receiving federal funds. We have no reason to doubt, and every reason to hold the Government to, that interpretation of § 1(a).

### III. Conclusion

For the foregoing reasons, we conclude that the President acted within his constitutional authority in issuing Executive Order No. 13,202 and that the Executive Order expresses a proprietary policy that is not subject to preemption by the NLRA. Therefore, the judgment of the district court is reversed and its injunction is vacated.

*So ordered.*