KAREN NELSON MOORE, Circuit Judge,
dissenting.
The Supreme Court has held that a state cannot regulate activity protected by the National Labor Relations Act (“NLRA”). In 2012, however, the Michigan legislature enacted the amended Fair and Open Competition in Governmental Construction Act (“amended Act”), a statute forbidding all governmental units in Michigan from entering into project labor agreements (“PLAs”), a kind of collective bargaining agreement typically associated with construction projects and expressly protected by the NLRA. This sweeping measure affects every governmental unit in the state, including local government entities, on every contract these units award, even those that are privately funded. By necessary implication, the amended Act also affects all labor organizations or trade councils seeking to enter into a PLA with a government entity. In short, Michigan implemented a statute that regulates collective bargaining.
The majority attempts to escape this conclusion by pointing out that there is a type of action that the amended Act does not regulate—-PLAs entered into by private parties. But this is unpersuasive for two key reasons. First, the issue in front of this court is whether the amended Act interferes with an organization’s right to convince a governmental unit to enter into a PLA, not whether the amended Act interferes with a private party’s right to enter into PLAs independently. Second, the fact that the amended Act does not regulate every PLA does not mean that it is not regulating some PLAs. We have never held that a statute must regulate everything in order to regulate something. Because I believe that we must follow the clear dictates of the Supreme Court that a state does not have the authority to enact broad statutes implementing labor policy in an area protected by the NLRA, I cannot agree with the majority’s conclusion. I respectfully dissent.
I. STANDARD OF REVIEW
As an initial matter, it is important to note that Snyder appeals from the district court’s grant of a preliminary injunction on enforcement of the amended Act, the review of which is governed by specific principles. The majority not only fails to recognize the posture of this appeal, but also declines to specify the standard under which it conducts its review. As a result, it is unclear on what basis the majority reverses the order of the district court. Because we review a district court’s grant of a preliminary injunction with great deference, the majority’s silence on this matter is troubling.
The applicable standard is summarized as follows. We must “reviewf ] the grant of a preliminary injunction for an abuse of discretion.” United States v. Edward Rose & Sons, 384 F.3d 258, 261 (6th Cir.2004). Under this standard, “[a] district court’s findings of fact underlying its decision to grant a preliminary injunction are *583 reviewed for clear error and the legal conclusions underpinning its decision are reviewed de novo.” Id. (internal quotation marks omitted). “Because a trial court’s decision to grant a preliminary injunction is accorded great deference, this court should disturb such a decision only if .the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.” Id. (internal quotation marks omitted).
There are four preliminary injunction factors that a court must consider:
(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.
Id. “The district court’s weighing and balancing of the equities is overxmled only in the rarest of cases.” Id. (internal quotation marks and alteration omitted). Certain of these factors, however, employ a separate standard of review. For example, “[t]he district court’s determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed de novo.” Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 541 (6th Cir.2007). I will focus my analysis on this factor.
II. PREEMPTION ANALYSIS
The NLRA preemption analysis involves two inquiries. First, a coxirt must consider whether the action at issue is “subject to pre-emption by the NLRA.” Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc. (“Boston Harbor”), 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). “It is by now a commonplace that in passing the NLRA • Congress largely displaced state regulation of industrial relations.” Wis. Dep’t of Indus., Labor, & Human Relations v. Gould, Inc. (“Gould”), 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). As a general matter, “States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.” Id. As explained in Boston Harbor, however, not all actions taken by a state are subject to preemption by the NLRA; in fact, only regulatory actions come under such scrutiny. 507 U.S. at 227, 113 S.Ct. 1190. When a state acts in a proprietary manner, for example, the state is not regulating. Id.
■ If a court determines that the legislation is regulatory, it must then address whether either of the two preemption principles established by the Supreme Court apply: (1) Garmon preemption, established in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), or (2) Machinists preemption, established in Lodge 76, International Association of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Boston Harbor, 507 U.S. at 224-26, 113 S.Ct. 1190. If the legislation is preempted under either principle, it cannot stand. Because my disagreement with the majority’s analysis is based largely on that which the majority omitted, I will set forth in detail the applicable legal framework before applying it to this appeal.
A. The Amended Act is Regulatory
The first inquiry a court must make is whether the state action is subject to preemption by the NLRA—i.e., whether the action is proprietary or regulatory in na *584 ture. The Supreme Court has explained that while “the NLRA prevents a State from regulating within a protected zone, ... [a] State does not. regulate, however, simply by acting within one of these protected areas.” Boston Harbor, 507 U.S. at 226-27, 113 S.Ct. 1190. “When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state regulation.” Id. at 227, 113 S.Ct. 1190. The Court further explained, though, that the government is held to a different standard than that of private parties when it comes to distinguishing between regulatory and proprietary conduct, for “[wjhen the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role.” Id. at 229, 113 S.Ct. 1190. “[A]s regulator of private conduct, the State is more powerful than private parties.” Id.; see also Gould, 475 U.S. at 290, 106 S.Ct. 1057 (“But government occupies a unique position of power in our society, and its conduct, regardless of form, is rightly subject to special restraints.”).
Because of the unique dynamic created when a state acts in the area of labor relations, the Supreme Court has given substantial guidance on the distinction between actions that are proprietary and actions that are regulatory. Specifically, the Supreme Court has identified two factors that should inform a court’s analysis on this point—the breadth of the action taken and whether the action reflects a legitimate interest in the efficient procurement of goods and services. The Court has also made clear that it is improper to rely on the way in which the state classifies the action. Instead, a court must focus on what the state action actually does and how it affects the rights protected by the NLRA.
Instead of following this binding Supreme Court precedent—as well as the decisions of the Second, Third, Fifth, Seventh, and Ninth Circuits; two panels of the D.C. Circuit; and a decision of this Court in Petrey v. City of Toledo, 246 F.3d 548 (6th Cir.2001), abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002)— the majority has chosen to adopt a standard set forth by a single panel of the D.C. Circuit that directly contradicts Supreme Court precedent. I cannot agree that this is the correct course.
The Supreme Court first acknowledged these guiding principles in Gould, where it was faced with determining whether the NLRA preempted a Wisconsin statute that “debarr[ed] certain repeat violators of the [NLRA] from doing business with the State.” 475 U.S. at 283, 106 S.Ct. 1057. In Gould, Wisconsin encouraged the Court to consider the statute as an exercise of its spending power rather than as a regulation of labor relations, and therefore not subject to preemption by the NLRA. Id. at 287, 106 S.Ct. 1057. The Court declined this invitation, asserting that how a state categorized an action made no difference, as “[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern.” Id. at 289, 106 S.Ct. 1057 (internal quotation marks omitted). The Court also rejected Wisconsin’s argument that it was acting in a proprietary capacity: “by flatly prohibiting state purchases from repeat labor law violators Wisconsin simply is not functioning as a private purchaser of services; for all practical purposes, Wisconsin’s debarment scheme is tantamount to regulation.” Id. (internal quotation marks and citation omitted).
Seven years later, the Supreme Court considered the issue again in Boston Har *585 bor, a case in which organizations challenged a single labor agreement entered into by the Massachusetts Water Resources Authority (“MWRA”). There, the Supreme Court determined that MWRA was not acting in a regulatory manner when it decided against employing a PLA in a ten-year, $6.1 billion cleanup project. Boston Harbor, 507 U.S. at 221, 232, 113 S.Ct. 1190. The Court’s analysis centered on the fact that “the challenged action in this litigation was specifically tailored to one particular job.” Id. at 232, 113 S.Ct. 1190. As such, the Court reasoned that “[tjhere is no question but that MWRA was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.” Id. When the state acts “in the role of purchaser of construction services,” the Court explained, there is “no basis on which to distinguish the incentives at work here from those that operate elsewhere in the construction industry.” Id. at 232-33, 113 S.Ct. 1190 (internal quotation marks omitted). The Court reiterated its emphasis on the narrow reach of the state’s conduct and the efficient procurement of services for that single project, leading it to conclude that the state was acting as a market participant rather than as a regulator.
Finally, the Court recently reiterated these principles in a case where several organizations argued that provisions of a California statute impermissibly regulated employer speech relating ■ to unions. Chamber of Commerce v. Brown, 554 U.S. 60, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008). The Court agreed, stating that “[i]t is beyond dispute that California enacted AB 1889 in its capacity as a regulator rather than a market participant.” Id. at 70, 128 S.Ct. 2408. Importantly, the Court described the Boston Harbor standard as follows: “In finding that the state agency had acted as a market participant, we stressed that the challenged action was specifically tailored to one particular job, and aimed to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.” Id. (internal quotation marks omitted). Additionally, it emphasized that the stated purpose of a statute does not govern the analysis. > To that end, the Court rejected “the neutral statement of policy” set forth in the preamble and instead relied on the substance of the statute and its effects. Id. at 63, 128 S.Ct. 2408. The Court stated that “[i]n NLRA pre-emption cases, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.” Id. at 69, 128 S.Ct. 2408 (internal quotation marks omitted).
Additionally, the vast majority of our sister circuits to have addressed NLRA preemption have chosen to follow this framework. One of the first circuits to examine this issue in light of the Supreme Court’s ruling in Boston Harbor was the D.C. Circuit. In Chamber of Commerce v. Reich, 74 F.3d 1322 (D.C.Cir.1996), the D.C. Circuit struck down an executive order “barring the federal government from contracting with employers who hire permanent replacements during a lawful strike.” Id. at 1324. The D.C. Circuit distinguished this case from Boston Harbor on several grounds. First, the D.C. Circuit explained that “[i]t does not seem to us possible to deny that the President’s Executive Order seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers.” Id. at 1337. In fact, the court hypothesized that in Boston Harbor, “[sjurely, the result would have been entirely different, given the Court’s reasoning, if Massachusetts had passed a general law or the Governor had issued an *586 Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements ... containing [PLAs].” Id. Given the breadth of the policy set forth in this case, the court reasoned, the executive order “cannot be equated to the ad hoc contracting decision made by MWRA in seeking to clean up Boston Harbor.” Id.
Second, the court described the unique role the NLRA plays in situations where a government entity attempts to regulate labor relations: “labor relations policy is different because of the NLRA and its broad field of pre-emption. No state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or its purpose may be.” Id. Applying that standard to the case at hand, the D.C. Circuit noted that because “the premise of the Executive Order is the proposition that the permanent replacement of strikers unduly prolongs and widens strikes and disrupts the proper ‘balance’ between employers and employees^] ... [w]hatever one’s views on the issue, it surely goes to the heart of United States labor relations policy.” Id.
In 2002, however, the D.C. Circuit employed a different analysis in Building & Construction Trades Department, AFL-CIO v. Allbaugh, 295 F.3d 28 (D.C.Cir.2002), a case examining an executive order “provid[ing] that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a [PLA].” Id. at 29. Because the language in the executive order mirrors the language of the amended Act, the majority adopts Allbaugh’s logic wholesale. Upon review of the Supreme Court precedent in this area, however, I must agree with the district court’s assessment that Allbaugh misconstrues critical aspects of Gould, Boston Harbor, and Brown and runs contrary to the great weight of authority on NLRA preemption.
The Allbaugh court concluded that the executive order at issue was proprietary in nature, explaining that “[b]ecause the Executive Order does not address the use of PLAs on projects unrelated to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as ‘regulatory.’ ” Id. at 36. As pointed out by the district court, however, Allbaugh relies heavily on a proposition from Boston Harbor that was taken wholly out of context. Specifically, Allbaugh states that “[a] condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in Boston Harbor, it ‘addressed] employer conduct unrelated to the employer’s performance of contractual obligations to the [Government].’ ” Id. at 36 (quoting Boston Harbor, 507 U.S. at 228-29, 113 S.Ct. 1190) (alterations in original). In fact, Boston Harbor states as follows:
Respondents quote the following passage from Gould, arguing that it stands for the proposition that the State as proprietor is subject to the same preemption limitations as the State as regulator.]
The above passage does not bear the weight that respondents would have it support. The conduct at issue in Gould was a state agency’s attempt to compel conformity with the NLRA. Because the statute at issue in Gould addressed employer conduct unrelated to the employer’s performance of contractual obligations to the State, and because the State’s reason for such conduct was to deter NLRA violations, we concluded: *587 Wisconsin simply is not functioning as a private purchaser of services, and therefore, for all practical purposes, Wisconsin’s debarment scheme is tantamount to regulation. We emphasized that we were not saying that state purchasing decisions may never be influenced by labor considerations.
Boston Harbor, 507 U.S. at 228-29, 113 S.Ct. 1190 (internal quotation marks, citations, and alterations omitted).
The discrepancy between these two passages makes clear that it was inaccurate to characterize Boston Harbor as holding that the only relevant consideration is whether the conduct at issue is unrelated to the performance of contractual obligations. As an initial matter, this passage is not the holding of Boston Harbor, rather, it merely acts to rebut the respondent’s argument that a state is subject to preemption limitations even when it is acting in a proprietary capacity. Moreover, as shown above, the Boston Harbor Court relied on at least two other factors in reaching its decision—the scope of the action and whether it reflected the state’s interest in efficiently procuring goods and services. That these factors are the critical import of Boston Harbor is further supported by the fact that the Brown Court’s description of the Boston Harbor standard includes these two factors rather than the factor relied on by the Allbaugh court. Whether the conduct at issue is unrelated to the performance of contractual obligations is simply not the only relevant factor at issue. In fact, it is not even a central one.
Another concern that I have with the majority opinion is the fact that it adopted the Allbaugh court’s statement “that there simply is no logical justification for holding that if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as a market participant.” 295 F.3d at 35 (internal quotation marks and alteration omitted). As an initial matter, this statement ignores the detailed descriptions .given by the Supreme Court distinguishing regulatory and proprietary conduct. For example, it completely ignores the fact that breadth is one of the two most important considerations to take into account when making this determination.
More importantly, I cannot agree with this assertion because it directly contradicts a principle well established by the Supreme Court: states must abide by different standards than private actors in areas governed by the NLRA. In Gould, the Court reminded us that “[wjhat the Commerce Clause would permit States to do in the absence of the NLRA is thus an entirely different question from what States may do with the Act in place.” 475 U.S. at 290, 106 S.Ct. 1057. The NLRA “treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play.” Id. For example, while private actors may “regulate” by adopting a broad policy based wholly on principle, “States have a qualitatively different role to play from private parties.” Boston Harbor, 507 U.S. at 229, 113 S.Ct. 1190. When a state acts based on principle, “it performs a role that is characteristically a governmental rather than a private role.” Id. I thus cannot agree with the majority that there is no distinction between actions taken by a government entity and a private proprietor in this area. Maj.- Op. at 578 (“But private proprietors can and do act on an across-the-board basis without somehow becoming regu *588 lators.”). That a private proprietor can act in a way tantamount to regulation where a government entity cannot is a fundamental principle upon which the Supreme Court relies time and again. I would reject the Allbaugh court’s analysis and instead rely on the NLRA preemption principles asserted by the Supreme Court.
Moreover, other courts have examined language virtually identical to that at issue in Allbaugh and have reached the opposite result. For example, the Ohio Supreme Court considered a statute with provisions similar to those at issue in Allbaugh and concluded that it was regulatory in nature. Ohio State Bldg. & Constr. Trades Council v. Cuyahoga Cnty. Bd. of Comm’rs, 98 Ohio St.3d 214, 781 N.E.2d 951, 953, 970 (2002). In its opinion, the court explained that the legislation at issue “is a blanket, across-the-board prohibition that precludes any sort of ad hoc determination as to the benefits or advantages of utilizing a PLA on a particular project. It is therefore “ ‘tantamount to regulation” or policymaking.’ ” Id. at 969-70 (quoting Boston Harbor, 507 U.S. at 229, 113 S.Ct. 1190).
In reaching this conclusion, the Ohio Supreme Court interpreted Boston Harbor to “suggest[ ] that a state would be acting as a regulator or policymaker, rather than as a purchaser, proprietor, or market participant, were it to impose an across-the-board rule that either requires or prohibits the use of PLAs on all public construction projects.” Id. at 966. Furthermore, the court expressly rejected the logic of All-baugh, explaining that its “reasoning, we believe, places the proverbial cart before the horse. These courts assume that a state acts as a market participant by doing what a private actor may do under the NLRA.” Id. at 968-69. “But the gist of Boston Harbor is that a state may act as a private contractor would act when it acts as a market participant. Otherwise, the state would be permitted to regulate within a protected zone because a private actor may do so.” Id. at 968-69. I cannot agree with the majority’s decision here to ignore these weaknesses of the Allbaugh analysis, especially in light of the clear Supreme Court precedent pointing out the problems with undertaking such an analysis.
Finally, it is important to recognize that we have adopted previously a test set forth by the Fifth Circuit in Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686 (5th Cir.1999). Petrey v. City of Toledo, 246 F.3d 548 (6th Cir.2001), abrogated on other grounds by City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). In addition to my belief that we should employ this standard because it is correct, I must also note that we must adhere to this standard because it was adopted in a published decision of this court. The majority’s refusal to recognize this fact does not make it any less relevant.
In Cardinal Towing, the Fifth Circuit summarized the controlling precedent as follows, which I believe to be accurate: “The Supreme Court has found that when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulation subject to preemption.” 180 F.3d at 691. “When, however, a state attempts to use its spending power in a manner tantamount to regulation, such behavior is still subject to preemption.” Id. (internal quotation marks omitted). The Fifth Circuit thus developed the following test for discerning whether a state’s conduct is proprietary:
First, does the challenged action essentially reflect the entity’s own interest in its efficient procurement of needed *589 goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?
Id. at 693. Unlike the standard employéd in Allbaugh, this test incorporates all of the relevant considerations noted in Boston Harbor and Brown. Recognizing this fact, the Second and Ninth Circuits have also adopted the Fifth Circuit test. See Johnson v. Rancho Santiago Cmty. College Dist., 623 F.3d 1011, 1023 (9th Cir.2010); Healthcare Ass’n of New York State, Inc. v. Pataki, 471 F.3d 87, 109 (2d Cir.2006).
The Third Circuit has similarly created a two-part test that focuses on these principles: “First, does the challenged funding condition serve to advance or preserve the state’s proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition ‘specifically tailored’ to the proprietary interest?” Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hospitality Res., LLC, 390 F.3d 206, 216 (3d Cir.2004). The Third Circuit reached this standard after engaging in a detailed analysis of the difference between regulatory and proprietary conduct, explaining that “[t]he pivotal difference [between Gould and Boston Harbor] is that in the former case' the state deployed its spending authority to achieve a goal far broader than merely protecting or fostering its own investment or proprietary interest, while in the latter instance the public agency limited its spending conditions to the protection of its investment or proprietary interest.” Id. at 214. Notably, the Third Circuit’s standard references only a “proprietary interest in a project or transaction.” Id. at 216 (emphasis added). By its own terms, then, it would not define as proprietary an action affecting all projects controlled by any governmental unit.
Additionally, although it did not adopt a two-part test, the Seventh Circuit has articulated a standard similar to that of the Second, Third, Fifth, and Ninth Circuits— one that focuses on the scope of the action. N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004 (7th Cir.2005). In Lavin, the Seventh Circuit held that “[bjecause Illinois has limited its condition to the project financed by the subsidy, it has not engaged in ‘regulation’ under the approach of Boston Harbor or Gould, and its conditions are not preempted by federal labor law.” Id. at 1007; see also Colfax Corp. v. Ill. State Toll Highway Auth., 79 F.3d 631, 634 (7th Cir.1996) (concluding that the state action at issue was proprietary because the state had not enacted a statute or passed a general rule).
Also significant is UAW-Labor Employment & Training Corp. v. Chao, 325 F.3d 360 (D.C.Cir.2003). When given the opportunity to address this issue for a third time, the D.C. Circuit opted to revert to the principles it asserted in Reich. Reviewing an executive order that applied “to all government contracts involving more than $100,000,” the court stated that “[a] clause is likely to be found regulatory where it apparently seeks to set a broad policy.” Id. at 362-63 (internal quotation marks omitted). Citing Reich, the court concluded that the action was regulatory: “But as the order operates on government procurement across the board, rather than being tailored to any particular setting, the order is regulatory under prevailing principles.” Id.
With the exception of Allbaugh, then, courts that have addressed this issue post-Gould and Boston Harbor, including the *590 Supreme Court, focus on whether the challenged action reflects an interest in efficiently procuring these goods and services and on the scope of that action. Against this backdrop, I believe that we should continue to employ the Fifth Circuit test— considering whether “the challenged action essentially reflect[s] the entity’s own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances” and whether “the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.” Cardinal Towing, 180 F.3d at 693. I also believe that this standard requires us to construe the amended Act as regulatory.
First, the breadth of the amended Act is undoubtedly expansive. By its own terms, it applies to all governmental units, which Michigan has defined as “this state, a county, city, township, village, school district, intermediate school district, community college, or public university that receives appropriations from this state, or any agency, board, commission, authority, or instrumentality of the foregoing.” Mich. Comp. Laws § 408.873. Additionally, the amended Act applies without regard to the source of the project’s funding. In other words, even a school district that is overseeing a privately funded project is forbidden from entering into a PLA on that project. Moreover, because PLAs necessarily include every contractor and subcontractor working on the project, all organizations that would ordinarily seek to enter into a PLA with any of these governmental units are affected, as the amended Act makes it impossible for them to enter into a PLA with these governmental units.
The only way in which the majority even attempts to reconcile the breadth of these provisions with its conclusion that the amended Act is sufficiently narrow to be considered proprietary is by pointing out actions that the amended Act does not regulate—in particular, PLAs entered into between private parties. But this approach evades the critical issue we must resolve in two key respects. First, it misstates the right at issue in this appeal. Contrary to the majority’s assertions otherwise, the right at issue is not an organization’s ability to enter into a PLA generally. Rather, it is the right to attempt to convince a governmental entity to enter into a PLA, an action that is wholly precluded by the plain terms of the amended Act. The significance of the majority’s misguided analysis on this point cannot be overstated. Imperative to assessing whether a statute regulates a right is recognizing correctly the right at issue. Relatedly, when the right at issue is wholly precluded by the action at issue, it is hard to understand how the action can be construed as narrow with respect to its effect on the right.
Second, in assessing the breadth of an act, it is critical to consider what that act actually does. Instead of taking this approach, however, the majority chooses to articulate only that which the amended Act does not do. This cannot be a persuasive approach. If it were, then every state action could be construed as narrow, as no statute exists that covers all actions taken by every actor. An analysis of that which the amended Act does not cover should not supplant an analysis of that which the amended Act does cover.
It is also important to note that with the exception of Attbaugh, the amended Act is dissimilar from those actions that have been upheld in previous cases, as it constitutes an across-the-board policy with no temporal or project-based limits. For example, in Boston Harbor, the Supreme *591 Court upheld the state action because it “was specifically tailored to one particular job,” a point that it later reiterated in Brown. Boston Harbor, 507 U.S. at 232, 113 S.Ct. 1190. Likewise, in Lavin, the Seventh Circuit found a state action proprietary where it “limited its condition to the project financed by the subsidy.” 431 F.3d at 1007; see also Sage Hospitality Res., 390 F.3d at 217-18 (upholding a requirement where it was “limited to hotels and hospitality projects receiving TIF funds”). Here, the amended Act affects all projects developed by every governmental unit in the state. It has no provision limiting its applicability to a geographic region or type of project, let alone one that would restrict it to a single project. In Rancho Santiago, the Ninth Circuit similarly focused on the scope of the action when it upheld a PLA on the basis that it was limited to a three-to-five-year period for all projects carried out in a college district. 623 F.3d at 1028-29. Here, there is no such temporal limitation.
Furthermore, the actions that have been struck down by courts are strikingly similar to the amended Act. For example, in Reich the D.C. Circuit struck down an executive order on the basis that it was not limited to an “ad hoc contracting decision” as was the case in Boston Harbor. 74 F.3d at 1337. Rather, the court explained, it was clear that the executive order “seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers.” Id. The Ohio Supreme Court also struck down a statute based on its breadth, as the statute was “a blanket, across-the-board prohibition that precludes any sort of ad hoc determination as to the benefits or advantages of utilizing a PLA on a particular project.” Ohio State Bldg. & Constr. Trades Council, 781 N.E.2d at 969-70. Here, the amended Act similarly precludes all governmental units from making any ad hoc determinations relating to the benefits of using a PLA on a particular project. In sum, the amended Act is most similar to those governmental actions that have been struck down by courts and is dissimilar from those that courts have upheld.
With respect to the efficient-procurement factor, I am most concerned by the majority’s assertion that because “the government unquestionably is the proprietor of its own funds, ... when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity.” Maj. Op. at 580 (internal quotation marks omitted). This cannot be true. If it were, then two critical principles articulated by the Supreme Court would effectively be rendered null: (1) the express instruction to consider the breadth of the action as a factor in this analysis and (2) the tenet that broad actions taken by a state actor are tantamount to regulation even where a private actor would be allowed to act. As articulated in greater detail above, in areas governed by the NLRA the Supreme Court has made clear that while private actors may “regulate” by adopting a policy based wholly on principle, “States have a qualitatively different role to play from private parties.” Boston Harbor, 507 U.S. at 229, 113 S.Ct. 1190. The majority, however, does not even mention this limitation.
Furthermore, I cannot agree with the majority’s conclusion that the statute reflects a mere interest in efficient procurement of goods and services rather than an attempt to affect labor policy. Notably, the only sources the majority cites in support of this contention are those that the Supreme Court has expressly discouraged, including the amended Act’s statement of intent, its legislative history, and whether it is ultimately effective. As explained above, however, the Supreme Court has *592 instructed us to focus on what the state action does as opposed to how it is described. And here, the state action at issue forecloses all governmental units from entering into a specific kind of collective bargaining agreement. This is not a neutral action based in efficiency. It is an attempt to affect labor policy.
Likewise, the majority is incorrect to cite the effectiveness of the amended Act as a reason supporting its determination that it is proprietary. See, e.g., Rancho Santiago, 623 F.3d at 1025 (“[Wjhether the [action’s] benefits outweighed its costs ... bears only on whether the [entity] made a good business decision.”). The majority offers no authority to the contrary explaining why these sources should be considered. To the extent the majority relies on these sources, its analysis should be discounted. I would therefore agree with the district court that the amended act does not reflect an interest in the efficient procurement of goods and services.
B. Garmon and Machinists Preemption
Because I would hold that amended Act was regulatory rather than proprietary, I will briefly address whether it is preempted by the NLRA. “Although the NLRA itself contains no express pre-emption provision, [the Supreme Court has] held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy.” Brown, 554 U.S. at 65, 128 S.Ct. 2408. “The first, known as Garmon pre-emption, is intended to preclude state interference with the National Labor Relations Board’s interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.” Id. (internal quotation marks and citation omitted). “To this end, Garmon pre-emption forbids States to regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.” Id. (internal quotation marks omitted). “The second, known as Machinists pre-emption, forbids ... States to regulate conduct that Congress intended be unregulated.” Id. (internal quotation marks omitted). “Machinists pre-emption is based on the premise that Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.” Id. (internal quotation marks omitted).
The first step in these preemption analy-ses is to determine whether the district court was correct in concluding that the NLRA protects a trade association’s right to attempt to convince a public entity to enter into a PLA and that the amended Act interferes with this right. Snyder argues that the district court’s conclusion that this right is protected was unsupported by any legal authority. The district court’s conclusion that the right to convince the state to enter into a PLA is a concerted activity protected under Section 7 of the NLRA, however, is supported by the text of Sections 7 and 8 of the NLRA, as well as Supreme Court precedent.
Section 7 of the NLRA provides that “[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. § 157. The Supreme Court has recognized that this is a broad provision, explaining that “labor’s cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context.” Eas-tex, Inc. v. NLRB, 437 U.S. 556, 565, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). With respect to Section 8, the Supreme Court has established two significant principles. First, it asserted that “Section 8(f) explicit *593 ly permits employers in the construction industry—but no other employers—to enter into prehire agreements [ (PLAs) ].” Boston Harbor, 507 U.S. at 230, 113 S.Ct. 1190. Second, the Court explained that “[pjrehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees.” Id.
In light of this authority, Snyder’s argument that an employee’s right to convince the state to enter into a PLA, a type of agreement authorized by Section 8(f) and deemed a collective bargaining agreement by the Supreme Court, is not protected under the Section 7 right “to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection” is unpersuasive. 29 U.S.C. § 157. Moreover, it seems evident that a statute forbidding a governmental unit from entering into a PLA interferes with the right to convince the state to enter into a PLA. The majority’s attempt to dodge this issue by focusing on the fact that contractors can enter into a PLA with one another is unpersuasive, as it says nothing about the right to convince the state to enter into a PLA. I would thus hold that the district court was correct to recognize this as a right protected by the NLRA and as one with which the amended Act interferes.
Upon determining that the right is protected and that the state action interferes with the right, the next step is to apply the Garmon and Machinists doctrines. The district court concluded that both Garmon and Machinists preemption apply to the Acts. Because the right to attempt to convince governmental units to enter into a PLA is protected under Section 7 of the NLRA, there seems to be no doubt that Garmon preemption would apply, as Gar-mon preemption prohibits state or local regulation of activities protected under Section 7 of the NLRA. Garmon, 359 U.S. at 244, 79 S.Ct. 773.
Likewise, Machinists preemption, which prohibits state and local regulation of areas meant to be left unregulated, applies to the amended Act. Under this doctrine, however, the focus is whether the state regulation upsets the balance of power between management and employees that Congress established in the NLRA. Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190. At issue here, then, is Section 8 of the NLRA-—specifically, whether the amended Act upsets the balance Congress created by expressly allowing for PLAs in the construction industry. It seems obvious that a regulation prohibiting a type of collective bargaining agreement that the NLRA allows would upset the balance of power established by Congress in the NLRA. I would agree with the district court’s conclusion that the trade councils are likely to succeed on the merits of their claims under both Garmon and Machinists preemption.
III. CONCLUSION
For the reasons stated, I would affirm the district court’s preliminary injunction against the enforcement of the amended Act. I respectfully dissent.